**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


NUCLEAR WATCH NEW MEXICO,

      Plaintiff,

v.                                              No. 1:16-cv-00433-JCH-SCY

UNITED STATES DEPARTMENT
OF ENERGY and LOS ALAMOS
NATIONAL SECURITY, LLC,

      Defendants,

and

NEW MEXICO ENVIRONMENT
DEPARTMENT

      Intervenor.


## MEMORANDUM OPINION AND ORDER

Plaintiff Nuclear Watch New Mexico, a project of the Southwest Research and Information Center, is dedicated to citizen action that promotes environmental protection and cleanup at nuclear facilities. Pl.'s Sec. Am. Compl., Doc. 42, ¶ 4 ("Complaint"). Plaintiff brings this action against the United States Department of Energy ("DOE"), Los Alamos National Security, LLC ("LANS") and Intervenor New Mexico Environment Department ("NMED") ("Defendants"), alleging violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.* (2017) and corresponding laws of the New Mexico Hazardous Waste Act, N.M. Stat. Ann. §§ 74-4-1 – 74-4-14 (2017) ("NMHWA") relating to hazardous waste management at Los Alamos National Laboratory ("Laboratory"). Plaintiff seeks declaratory and injunctive relief, civil penalties, and costs of litigation, including attorney fees.

Pending are NMED's Motion to Dismiss [Doc. 45] pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), claiming lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted; DOE's Motion to Dismiss [Doc. 47] pursuant to Rule 12(b)(1); and LANS' Motion to Dismiss [Doc. 48] under Rules 12(b)(1) and 12(b)(6), or Alternatively for Court Abstention under the doctrines of *Burford* and Primary Jurisdiction abstention. Having reviewed the motions, briefs, evidence, and relevant law, the Court concludes that the motions should be granted in part and denied in part as explained herein.

## Statutory and Regulatory Background

To better contextualize the facts of this case, the Court begins by reviewing the statutory framework known as RCRA and its state analog, the NMHWA. RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. *See Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 331–32 (1994). RCRA's primary purpose is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated...." *Meghrig v. KFC W., Inc.,* 516 U.S. 479, 483 (1996). Citizens are permitted to bring private suits under RCRA in certain circumstances, but the "chief responsibility for the implementation and enforcement of RCRA rests with the Administrator of the Environmental Protection Agency." *Id.* at 483–84 (citing 42 U.S.C. § 6902(b)). Section 3006 of RCRA, 42 U.S.C. § 6926(b), allows the states to develop hazardous waste programs at least as stringent as RCRA, subject to authorization by the Administrator of the EPA. After receiving authorization, the state may implement its hazardous waste program "in lieu of the Federal program." *Id.* "When a state program is authorized under RCRA, federal regulations are displaced or supplanted by state regulations." *United States v. Richter*, 796 F.3d 1173, 1183 (10th Cir. 2015).

Consistent with RCRA's delegation of authority to the states, in 1985 the State of New Mexico received EPA authorization to implement its hazardous waste program in lieu of the federal program. The NMHWA requires the New Mexico Environmental Improvement Board to adopt rules for the management of hazardous waste and standards applicable to owners and operators of facilities that treat, store or dispose of hazardous waste. *See* N.M. Stat. Ann. § 74-4-4(A)(6). Intervenor NMED provides "hazardous waste permits" to owners or operators of hazardous waste facilities such as LANS and DOE to treat, dispose, and store waste. *See* N.M. Stat. Ann. 74-4-4.2. NMED also has enforcement capabilities against a person who violates the NMHWA or a condition of a permit issued under the NMHWA, and can issue compliance orders, civil penalties, or enjoin a permit violator. *See id.* § 74-4-10(A)(1)-(2). Persons dissatisfied with decisions of the Secretary of the Environmental Department on any "final agency action" may appeal directly to the New Mexico Court of Appeals. *See* N.M. Stat. Ann. § 74-4-14 ("[a]ny person who is or may be affected by any final administrative action of the board or the secretary may appeal to the court of appeals for further relief within thirty days after the action.").

With regard to citizen suit enforcement, RCRA's "violation" provision allows any person to commence a lawsuit against any other person or entity "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A). These types of lawsuits are known as "permitting violation claims." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 504–05 (4th Cir. 2015). As relevant here, they may be brought "against a defendant who is alleged 'to be [currently] in violation' of a RCRA-based mandate, regardless of any proof that its conduct has endangered the environment or human health. The permit, etc., subject to suit under

subsection (a)(1)(A) can be either a state or federal standard that became effective pursuant to RCRA." *Id.* at 504 (citing § 6972(a)(1)(A)). Citizen suits are meant "to supplement rather than supplant government action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60 (1987).

In hearing citizen RCRA suits, district courts have statutory authority to grant various types of equitable relief necessary to address the violation or endangerment, as well as to impose civil penalties. 42 U.S.C. § 6972(a). District courts have discretionary power to impose on violators any appropriate civil penalties under 42 U.S.C. 6928(a) and (g), which provide for civil penalties of up to $25,000 per day per violation. In imposing civil penalties, it is appropriate for the court to take into account the seriousness of the violation and any good faith efforts to comply. *See* 42 U.S.C. § 6928(a)(3). A district court's decision to impose an amount of penalties is discretionary. *See United States v. Ekco Housewares, Inc.,* 62 F.3d 806, 814 (6th Cir. 1995) ("[t]he assessment of civil penalties is committed to the informed discretion of the court…."). Any civil penalty imposed on a violator must be paid to the United States Treasury and not to the plaintiff who instituted the suit. *Gwaltney,* 484 U.S. at 52.

RCRA contains notice and delay requirements whereby a plaintiff must send an intent to sue letter and then wait 60 days before filing suit. *See* 42 U.S.C. § 6972(b)(1)(A). The RCRA notice requirement creates a condition precedent to the commencement of a citizen suit, and its purpose is to "strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 30, 29 (1989). Statutory notice and delay provisions like the ones found in RCRA provide an alleged violator the opportunity to attempt compliance with its restrictions, thereby avoiding litigation based on the alleged violations. *Id.*

**Factual Background**[1]

The Laboratory designs and tests nuclear weapons, produces plutonium pits, researches and tests high explosives and material science, designs lasers, and engages in photographic processing. Compl., ¶ 27. As a result of these operations, the Laboratory and has "generated," "treated," "stored," "disposed of," and otherwise "handled" hazardous waste as defined by RCRA. *Id.* ¶ 34. The Laboratory is federally owned and is operated by DOE and a private contractor, LANS, under a hazardous waste permit issued to LANS and DOE by the Secretary of NMED. *Id.* ¶¶ 5, 6, 21.

The Laboratory spans 23,680 acres atop the Pajarito Plateau in Los Alamos County. *Id.* ¶ 28. Nineteen major surface drainages or canyons and their tributaries dissect the Pajarito Plateau. *Id.* The canyons run roughly west to east or southeast, and drain into the Rio Grande River, which flows along a portion of the Laboratory's eastern border. *Id.* ¶ 29. Four discrete hydrogeologic zones lay beneath the Pajarito Plateau's surface on which the Laboratory sits, one of which is a regional aquifer that supplies drinking water for the Laboratory and for surrounding communities, including the San Ildefonso Pueblo and Los Alamos County. *Id.* ¶¶ 30, 31.

As stated above, DOE and LANS have engaged in the disposal, storage, treatment, and release of hazardous waste at the Laboratory within the meaning of RCRA. *Id.* ¶¶ 35-37. Certain areas at the Laboratory are divided into what are called Technical Areas or "TAs" where hazardous waste is administered. *Id.* ¶ 32. Material Disposal Areas or "MDAs" are hazardous waste storage areas. *Id.* ¶ 33. Since 1943, DOE and LANS (and their predecessors) have disposed of hazardous waste in septic systems, pits, surface impoundments, trenches, shafts,

---

[1] The Court draws some of its factual background from exhibits outside of the pleadings. Although the record is typically limited on a motion to dismiss, where, as here, a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), a court may consider extraneous exhibits. *See supra*, pp. 17-19.

landfills, and waste piles at the Laboratory. *Id.* ¶ 35. As a result, DOE and LANS have discharged hazardous waste in industrial wastewater and other waste from outfalls into many of the canyon systems under the Laboratory. *Id.* Hazardous wastes that have been released into and detected in the groundwater beneath the Laboratory include explosives, such as RDX; volatile organic compounds such as trichloroethylene, dichloroethylene, and dichloroethane; metals such as molybdenum, manganese, beryllium, lead, cadmium, hexavalent chromium, and mercury; and perchlorate. *Id*. ¶ 39. Hazardous waste constituents have been detected beneath the Laboratory in all four groundwater zones. *Id.*

Hazardous wastes have also been released into and detected in soils and sediments at the Laboratory. *Id.* ¶ 38. Such wastes include explosives, such as RDX, HMX, and trinitrotoluene (TNT); volatile organic compounds and semi-volatile organic compounds; metals such as arsenic, barium, beryllium, cadmium, hexavalent chromium, copper, lead, mercury, molybdenum, silver, and zinc; and polychlorinated biphenyls. *Id.*

In May 2002 NMED determined that the presence of hazardous waste at the Laboratory presented an imminent and substantial endangerment to health or the environment, and ordered a series of corrective tasks at the Laboratory. *Id.* ¶¶ 40, 41; 2005 Consent Order, Doc. 51-1 at 9. This triggered nearly three years of litigation and settlement discussion between DOE, NMED, and the Regents of the University of California (LANS' predecessor). Compl. ¶ 39; 2005 Consent Order at 9-10. On March 2, 2005, NMED, DOE and the Regents of the University of California entered into compliance on consent order ("2005 Order"). Compl. ¶ 41. Its stated purpose was to determine the nature and extent of environmental contamination at the Laboratory, to identify and evaluate alternatives for cleanup of environmental contamination, and to implement cleanup. *Id*. NMED is statutorily authorized to enter into such consent orders

whenever it determines that "any person has violated ... any requirement of the Hazardous Waste Act, any rule adopted and promulgated pursuant to that act or any condition of a permit issued pursuant to that act …." N.M. Stat. Ann. 74-4-10. The 2005 Order's issuance was preceded by a 30-day period of public review and comment of the proposed order. *See* 2005 Consent Order at 10. Although the parties at various times gave the public notice of the 2005 Order when it was in its draft stage, *see id.* at 9-10, there is no record evidence that the 2005 Order's issuance was preceded by a public hearing.

The 2005 Order set forth 80 specific remedial tasks over a ten-year period for investigating and cleaning up environmental contamination at the Laboratory. Compl. ¶ 44; 2005 Consent Order at 23-37. Under the 2005 Order DOE and LANS could seek NMED's permission to extend deadlines to complete these tasks, but only on a showing of "good cause." Compl. ¶ 45. Following this scheme, NMED extended numerous corrective task deadlines for good cause. However, in this lawsuit Plaintiff identifies 13 tasks whose deadlines NMED did not extend for good cause – including submission of numerous completion reports, investigation schedule reports, and groundwater monitor installation plans – thereby "leaving no factual doubt as to the existence of any of these violations." *Id*. ¶¶ 45, 54-99. The latest deadline associated with a corrective task was December 6, 2015. 2005 Consent Order at 36. On that date, a remedy completion report for MDA G was due. *Id*. According to Plaintiff, December 6, 2015 represented a "final compliance date" for completion of all corrective action.[2] Compl. ¶ 105.

---

[2] Defendants assert that there is no "final compliance date" in the 2005 Order. According to Plaintiff, Plaintiff found the last date in the compliance schedule, December 6, 2015, and then extrapolated that date as the final completion date for all corrective activity. Defendants contend that this is a "Plaintiff-created fiction" that does not exist in the 2005 Order or its implementing regulation.

The 2005 Order also laid out rules for its modification. *See* 2005 Consent Order at 16. Those rules essentially allowed the 2005 Order to be modified but, depending on the nature of the modification, required DOE and LANS to give public notice and provide the public an opportunity to comment. *See id.* at 16, 21; 20.4.1.900 NMAC (adopting 40 C.F.R. Part 270 (2017)). There are three classes of modification requests – Class 1, Class 2 and Class 3 – and each type has corresponding procedural requirements. As relevant here, if the requested modification is a Class 3 request, then it requires the most extensive procedures. An example of a Class 3 request is an "extension of a final compliance date" of the order's compliance schedule. *See* 40 C.F.R. § 270.42, App. I. Thus, if the DOE and NMED made a Class 3-type request to modify the 2005 Order, NMED was required to provide "an opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." N.M. Stat. Ann. § 74-4-4.2(H). A public hearing is an adversarial proceeding held before a hearing officer. *See* 20.4.1.901(F) NMAC.

Regarding enforcement, the 2005 Order incorporated RCRA citizen suit enforcement provisions under § 6972(a)(1)(A). More specifically, the 2005 Order stated that "each requirement of this Consent Order is an enforceable 'requirement' … of RCRA within the meaning of" § 6972(a)(1)(A) that allowed RCRA-style permitting violation claims to be brought against the parties if the were "alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A). *See* 2005 Consent Order at 20.

Outside events eventually prompted NMED and DOE to reconsider aspects of the 2005 Order. In June 2011, the Las Conchas wildfire's dangerous encroachment near the Laboratory

prompted NMED to request of DOE that it prioritize the removal of high risk, above ground transuranic waste located within TA-54 at the Laboratory. Framework Agreement, Doc. 51-6 at 2. DOE agreed, and in 2012 the parties entered into a non-binding agreement to realign waste management priorities called the "Framework Agreement: Realignment of Environmental Priorities." *Id*. In the course negotiating that agreement, DOE stated that meeting the milestones of the 2005 Order was difficult because of past and anticipated funding shortfalls, and the parties agreed to renegotiate the 2005 Order at a future date. 2016 Consent Order, Doc. 47-3 at 10; *see id.*, Doc. 51-5 at 9.

Skipping forward to March 20, 2016, roughly four years after DOE and NMED signed the 2012 Framework, NMED posted on its website a draft consent order to "supersede" the 2005 Order and accepted public comments on the draft order on its website until May 31, 2016. Compl. ¶ 48. Plaintiff commented on the draft order, remarking among other things that under the 2005 Order's modification rules, NMED was required to hold a public hearing on the draft order so that members of the public could present testimony and cross-examine witnesses. *Id.* ¶ 49. NMED never did hold a public hearing though, and eventually it and DOE executed the draft order in June 2016. *Id.* ¶ 50. The new order ("2016 Order) expressly stated that it "supersede[d] the 2005 Compliance Order on Consent (2005 Consent Order) and settle[d] any outstanding alleged violations under the 2005 Consent Order," *id.* ¶ 51, and that it "encompasse[d] all scope included within the 2005 Consent Order, including that which has already been completed and that which has been identified subsequent to the effective date of the 2005 Consent Order." 2016 Consent Order, Doc. 51-5 at 7. A central feature of Plaintiff's lawsuit is that by executing the 2016 Order Defendants unlawfully extended numerous final compliance dates contained in the

2005 Order, which amounted to Class 3 modifications for which Defendants never held a public hearing.

The 2016 Order dispensed with the 2005 Order's waste clean-up schedule and replaced it with a new remediation process called a "campaign approach." *Id.*, Doc. 31-1 at 26. Under that approach, "corrective action activities required by this [the 2016 Order] [would] be organized into campaigns, generally based upon a risk-based approach to grouping, prioritizing, and accomplishing corrective action activities … [c]ampaigns, projects, tasks, and deliverables may be subject to two types of deadlines: milestones, which are enforceable; or targets, which are not enforceable." *Id.* According to DOE, under the 2016 Order, the parties agree on enforceable "milestones" for the current fiscal year, and set unenforceable "targets" for the subsequent two years. DOE's Mot. to Dismiss at 6. There are 15 future campaigns under the 2016 Order, five of which are in progress. 2016 Consent Order, Doc. 47-3 at 53-56. According to Plaintiff, unlike the 2005 Order, the 2016 Order does not contain a schedule for completion of corrective tasks or a final deadline for completion of all corrective action. Compl. ¶ 52. It instead allows NMED and DOE to meet and negotiate remediation schedules for the next fiscal year, suggesting that it gives them leeway to delay corrective tasks, whereas the 2005 Order firmly held DOE's and LANS' feet to the fire. *Id.*

Finally, Plaintiff claims that its executive director, Jay Coghlan, has a personal interest in the remediation of environmental contamination at the Laboratory. *Id.* ¶ 4. He is an avid hiker and rock climber and used to enjoy those activities in the surrounding canyons and cliffs, adjacent Bandelier National Monument and Sandia National Forests, and in the nearby town of White Rock, New Mexico. *Id.* However, Mr. Coghlan no longer rock climbs in a canyon downstream from the Laboratory because he believes that a variety of dangerous pollutants from

the Laboratory's legacy waste are contained in the canyon's intermittent streambed. *Id*. Plaintiff contends that if the Court orders LANL to remediate legacy waste more quickly and on a definite schedule, Mr. Coghlan could again enjoy recreational use of the area without concern for his health. *Id*.

**Procedural Matters**

Frustrated by the remediation task delays under the 2005 Order, in January 2016 Plaintiff sent DOE and LANS a RCRA notice of intent to sue letter ("RCRA notice letter" or "RCRA notice") for their failure to submit a remedy completion report for MDA-G due on December 6, 2015 under the 2005 Order's schedule. January 2016 RCRA Notice Letter, Doc. 51-2 at 3. Then Plaintiff sent a second RCRA notice letter on May 5, 2016 identifying 12 other remediation tasks that DOE and LANS allegedly violated. Seven days later, on May 12, 2016, Plaintiff filed this federal lawsuit alleging two RCRA claims against DOE and LANS for their failure to complete the 13 remediation tasks identified in the two RCRA notice letters, and sought declaratory and injunctive relief ordering them to do so.

NMED intervened. Doc. 25. Then, in June 2016, DOE and NMED executed the 2016 Order, which stated that it superseded the 2005 Order that was the basis of Plaintiff's RCRA notice letters and its lawsuit.

As a result of the intervening 2016 Order, Plaintiff sought to amend its complaint to challenge the new order's validity for allegedly failing to comply with modification rules requiring public involvement. On July 15, the parties filed a stipulated motion requesting new deadlines, giving Plaintiff until July 19, 2016 to file its amended complaint and Defendants until August 31, 2016 to answer, which the Court approved. Doc. 28. According to plan, on July 19 Plaintiff filed its First Amended Complaint, which re-alleged the content of its original

complaint, plus sought a declaratory judgment that the 2016 Order was invalid. On August 31, 2016, Defendants responded by filing motions to dismiss under Rule 12(b). Then, 21-days later, Plaintiff (without leave of court or consent of the parties) filed a Second Amended Complaint, doubling the number of counts. Defendants renewed their 12(b) motions against the Second Amended Complaint.

Counts I and II of Plaintiff's Second Amended Complaint are based on 13 violations of corrective tasks under the 2005 Order that DOE and LANS failed to complete. Plaintiff contends that they are jointly liable for an injunction ordering them to complete the unresolved corrective tasks and to pay $37,500 in civil penalties for each day they have not complied with those deadlines. *See* Compl. ¶¶ 53-99. LANS and DOE allegedly failed to complete the following 13 corrective tasks under the 2005 Order:

- Submission to NMED of a Remedy Completion Report for MDA A at TA-21 due June 18, 2014. *Id.* ¶ 54.
- Submission to NMED of an Investigation Report for the Cañon de Valle Aggregate Area at TA-15 due July 2, 2014. *Id.* ¶ 57.
- Installation of Well R-65 and submission of an accompanying Well Completion Fact Sheet due by June 30, 2014 and a Well Completion Report due November 30, 2014. *Id.* ¶¶ 60-62.
- Submission to NMED of an Investigation Report for the Lower Pajarito Canyon Aggregate Area due July 31, 2014. *Id.* ¶ 65.
- Submission to NMED of an Investigation Report for the Twomile Canyon Aggregate Area due August 30, 2014. *Id.* ¶ 68.
- Submission to NMED of an Investigation Work Plan for the Lower Water/Indio Canyon Aggregate Area due September 30, 2014. *Id.* ¶ 71.
- Submission to NMED of an Investigation Report the Cañon de Valle Aggregate Area at TA-16 due December 15, 2014. *Id.* ¶ 74.
- Submission to NMED an Investigation Report for the Upper Water Canyon Aggregate Area due December 31, 2104. *Id.* ¶ 77.
- Submission to NMED an Investigation Report for the Starmer/Upper Pajarito Canyon Aggregate Area due December 31, 2014. *Id.* ¶ 80.
- Installation of Well R-26i by December 31, 2014 and an accompanying Well Completion Summary Fact Sheet and Well Completion Report. *Id.* ¶¶ 83-85.
- Submission to NMED of a Remedy Completion Report for MDA AB, Areas 1, 3, 4, 11, and 12 due February 3, 2015. *Id.* ¶ 88.

- Submission to NMED of an Investigation Report for the Chaquehui Canyon Area due March 3, 2015. *Id.* ¶ 91.
- Submission to NMED of a Remedy Completion Report for MDA G at TA054 due December 6, 2015. *Id.* ¶ 96.

Count III is also based on violations of the 2005 Order. Plaintiff alleges that NMED unlawfully modified the 2005 Order by granting DOE and LANS extensions to complete numerous corrective tasks beyond the December 6, 2015 final compliance date. NMED's extensions of 13 corrective tasks—including borehole installations, tracer deployments, investigative and remedy completion reports, work plans, etc.—beyond December 6, 2015 amounted to a Class 3 modification request, requiring public involvement. Because DOE and LANS never included the public, Plaintiff asks the Court to enjoin Defendants from "implementing, or continuing to implement, any of the extensions and deferrals … until NMED first conducts a public hearing on the extensions." Prayer for Relief, Doc. 42, ¶ 3. Similarly, Count IV alleges that the 2016 Order itself, because it has no final compliance date, violated the 2005 Order. According to Plaintiff, "a change of a final compliance date from a date certain to no date at all is an extension of the final compliance date, and therefore a 'Class 3' modification." Compl. ¶ 135. Count V requests federal and state declaratory judgments under 28 U.S.C. § 2201 and N.M. Stat. Ann. 44-6-15 that NMED's timeline extensions under the 2005 Order were invalid. Under these same statutes, Count VI seeks federal and state declaratory judgment that Defendants unlawfully issued the 2016 Order by not following public notice requirements. Count VII asks for litigation costs.

In its Prayer for Relief, Plaintiff requests declaratory and injunctive relief, asking the Court to make Defendants stop implementing the 2016 Order, and start implementing the 2005 Order on "reasonable but aggressive schedule by the Court"; to discontinue extensions in the

2005 Order; and requests civil penalties of $37,500 for each day Defendants have violated the 2005 Order. *See* Prayer for Relief, ¶¶ 1-6.

**A. Plaintiff's Second Amended Complaint is the Operative Complaint**

Before turning to the merits, the Court must first examine which of Plaintiff's two amended complaints is properly before the Court. LANS and DOE characterize Plaintiff's First Amended Complaint as its one "as a right amendment" under Fed. R. Civ. P. 15(a)(1). They therefore believe that Plaintiff was required to seek the Court's leave to file its Second Amended Complaint under Rule 15(a)(2), necessitating the Court's analysis of which amended complaint governs this case.

Rule 15(a) provides:

(1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:

    (A) 21 days after serving it, or

    (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave ….

Fed. R. Civ. P. 15(a).

The typical case is where a plaintiff files its one matter of course amendment under 15(a)(1) and then seeks consent from the opposing party or leave of court to file a second amended complaint under 15(a)(2). Here, the reverse occurred: Plaintiff filed its First Amended Complaint with Defendants' consent, *i.e.* under 15(a)(2) as an "other amendment," and now Plaintiff attempts to use its one as of right amendment under 15(a)(1) to file its Second Amended

Complaint. Plaintiff stresses that Rule 15 gave it an "absolute right" to amend its complaint within 21-days of service of Defendants' 12(b) motions.

Various authorities suggest that Plaintiff is correct. As a starting point, the United States Court of Appeals for the Tenth Circuit and other circuits have noted that "Rule 15(a) guarantee[s] a plaintiff an absolute right to amend its complaint once at any time before the defendant has filed a responsive pleading." *Am. Bush v. City of Salt Lake*, 42 F. App'x 308, 310 (10th Cir. 2002); *accord James V. Hurson Assocs., Inc. v. Glickman,* 229 F.3d 277, 383-83 (D.C. Cir. 2000); *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1007 (9th Cir. 2015) (Rule 15 "expressly declar[es] … a 'right' to amend upon parties."). Moreover, the rule is "organized substantively, not chronologically" and "does not prescribe any particular sequence for the exercise of its provisions." *Ramirez*, 806 F.3d at 1007. Recognizing this, district courts within the Tenth Circuit have held that a plaintiff preserves its as of right amendment under 15(a)(1) even if the plaintiff obtained previous amendments through a different provision of Rule 15. *See e.g. Thompson v. Jiffy Lube Int'l, Inc*., 505 F. Supp. 2d 907, 913 (D. Kan. 2007) (plaintiff allowed to file second amendment as of right under 15(a)(1) although plaintiff made its first amendment with court's leave under 15(a)(2)).

Although LANS and DOE characterize Plaintiff's First Amended Complaint as its one as of right amendment, this is incorrect because that amendment was accomplished by a stipulation between the parties, making it an "other amendment" under 15(a)(2). Just because Plaintiff's first amendment was accomplished under 15(a)(2) does not mean, as LANS and DOE suggest, that Plaintiff waived its as of right amendment under 15(a)(1). Again, the rule "does not prescribe any particular sequence for the exercise of its provisions." *Ramirez*, 806 F.3d at 1007. Therefore, the question is whether Plaintiff complied with the timing strictures of the rule itself.

Under Rule 15, "a plaintiff has the right to amend within twenty-one days of service of the complaint (15(a)(1)(A)), or within twenty-one days of service of a motion under 12(b) … whichever comes first (15(a)(1)(B))." *Ramirez*, 806 F.3d at 1008. Plaintiff followed these rules. As recounted above, Plaintiff filed its First Amended Complaint on stipulation as an "other amendment" under 15(a)(2). Defendants responded to that complaint by filing 12(b) motions on August 31, 2016. Then, within 21-days, Plaintiff filed its Second Amended Complaint. Plaintiff had the right to amend within 21-days of service of these motions, and did not need Defendants' consent or the Court's leave to file its Second Amended Complaint. That amendment was made as of right. Consequently, "an amended complaint supercedes an original complaint and renders the original complaint without legal effect." *Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007). Plaintiff's Second Amended Complaint is the operative document in this case.

### B. RCRA Notice and Delay Provisions

RCRA has somewhat complex notice of intent to sue rules that LANS asserts Plaintiff did not fulfill. 42 U.S.C. § 6972(b)(1) requires a plaintiff to give a defendant notice of intent to sue, and then wait 60 days before filing a lawsuit. It states: "[n]o action may be commenced under [RCRA's citizen suit provision] ... prior to 60 days after the plaintiff has given notice of the violation to—(i) the Administrator; (ii) the State in which the alleged violation occurs; and (iii) to any alleged violator of such permit, standard, regulation, condition, requirement, prohibition, or order." 42 U.S.C. § 6972(b)(1)(i)-(iii). RCRA notice is jurisdictional, and absent compliance with a required notice provision, a court lacks subject matter jurisdiction to hear the RCRA claims.[3] *See Covington v. Jefferson Cty.,* 358 F.3d 626, 636 (9th Cir. 2004).

---

[3] A second jurisdictional bar on RCRA suits exists where a responsible state or federal agency diligently pursues judicial actions against alleged polluters under RCRA. *See* 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B), (b)(2)(C). This is called the "diligent prosecution bar." Plaintiff

However, in some instances a plaintiff need not delay in bringing a lawsuit. A suit "may be brought immediately … respecting a violation of subchapter III." 42 U.S.C. § 6972(b)(1)(A)(iii). Essentially, "Congress put aside notice requirements when plaintiffs allege violations of RCRA that involve presence of or mishandling of hazardous waste." *Covington*, 358 F.3d at 638. "[A] subchapter III claim regarding hazardous waste renders the required post-notice waiting period inapplicable to *all* of a plaintiff's RCRA claims." *Id. See also Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 154 (2nd Cir. 2006) ("if a plaintiff files a complaint alleging a RCRA subchapter III violation, … which frees a plaintiff from the otherwise applicable statutory delay periods, and if the complaint also alleges other 'closely related' violations, then … the plaintiff [may] [] proceed with the non-subchapter III claims without waiting for the expiration of the notification period.").

LANS asserts that Plaintiff did not serve RCRA notice for Counts I, III and V, thereby depriving the Court of subject matter jurisdiction over those counts. Plaintiff argues that it was excused from RCRA's notice and delay rules because it alleged subchapter III claims, meaning it could immediately package its subchapter III and non-subchapter III claims together in one complaint. Although the parties dispute whether Plaintiff's original complaint complied with RCRA's notice and delay rules, that complaint no longer exists because it has been superseded. As described earlier, Plaintiff's Second Amended Complaint is before the Court. The sole issue then is whether Plaintiff's Second Amended Complaint, filed on September 21, 2016, alleged subchapter III violations such that Plaintiff may bring its subchapter III and non-subchapter III claims in one complaint without delay. The Court finds that Plaintiff properly brought all of its

devoted time arguing that this jurisdictional bar does not apply. However, Defendants never raised the diligent prosecution bar as a ground for dismissal. The Court acknowledges Plaintiff's briefing on this matter, but it is not a disputed issue before the Court.

claims together in one complaint. Counts I and II alleged numerous subchapter III violations for LANS' and DOE's failure to complete 13 corrective tasks, and Plaintiff specifically pointed to a provision of subchapter III itself. *Cf. Bldg. & Const. Trades Council of Buffalo*, 448 F.3d at 155 (dismissing complaint as where it fail[ed] to specify any of the provisions of subchapter III itself, … or to allege explicitly a violation of any of the regulations promulgated thereunder."). As stated earlier, "a subchapter III claim regarding hazardous waste renders the required post-notice waiting period inapplicable to *all* of a plaintiff's RCRA claims." *Covington*, 358 F.3d at 638. Counts III and V are non-subchapter III violations, but Plaintiff did not have to provide notice or wait to bring those counts. Accordingly, the Court rejects LANS' argument that Plaintiff did not fulfill RCRA's notice and delay provisions, and determines that it has subject matter jurisdiction over Counts I, III, and V.

**Subject Matter Jurisdiction**

**A. Standards of Review**

All Defendants move to dismiss the Second Amended Complaint under Fed. R. Civ. P. 12(b)(1), asserting that this Court lacks subject matter jurisdiction over Plaintiff's RCRA claims for several reasons. In addition, Defendants claim that this Court lacks subject matter jurisdiction over Plaintiff's New Mexico state law claims for declaratory and injunctive relief because no federal question is involved, there is not complete diversity between the parties, and the state law claims do not appropriately invoke the Court's supplemental jurisdiction.

**i.      Analysis of 12(b)(1) Motion**

A plaintiff bears the burden of proving that subject matter jurisdiction exists. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the challenge can take

two forms: facial or factual. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). In a factual challenge, the movant goes "beyond allegations contained in the complaint [to] challenge the facts upon which subject-matter jurisdiction depends. *Id.* at 1003. In this case, the Defendants' challenge is factual, since Defendants contend, among other things, that the 2016 Order superseded the 2005 Order, rendering Plaintiff's complaints arising from the 2005 Order moot, a fact that would deprive the Court of subject matter jurisdiction. In reviewing Defendants' factual challenges to subject matter jurisdiction, "the district court may not presume the truthfulness of the complaint's factual allegations." *Id.* "A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* "In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Id.* In reviewing a factual subject matter jurisdiction attack, the court may weigh the evidence and find facts. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own.").

### ii.    Analysis of 12(b)(6) Motion

Defendants NMED and LANS also move to dismiss the Plaintiff's action under Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, (2009). Generally, when ruling on a 12(b)(6) motion, the court assumes that the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Sylvia v. Wisler*, 875 F.3d 1307, 1313–14 (10th Cir. 2017). A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. In contrast to ruling on a Rule 12(b)(1) motion, "[g]enerally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion." *Berneike v. CitiMortgage, Inc*., 708 F.3d 1141, 1146 (10th Cir. 2013). However, the court can properly consider "documents incorporated by reference in the complaint[] [and] documents referred to in and central to the complaint, when no party disputes its authenticity …." *Id*. In addition to exhibits incorporated by reference and ones that are central to the complaint and authentic, on a 12(b)(6) motion the court may also examine "matters of which a court may take judicial notice." *Id*.

Numerous exhibits outside of the pleadings totaling nearly 400 pages of documents are before the Court. LANS' Motion contains six exhibits that includes excerpts from the 2005 and 2016 Consent Orders; Plaintiff's RCRA notice of intent to sue letters; excerpts of a letter Plaintiff sent to NMED commenting on the 2016 CO; and a letter titled "Framework Agreement: Realignment of Environmental Priorities" entered into by NMED and DOE. DOE's Motion includes two exhibits, the 2005 and the 2016 Consent Orders, both of which are lengthy and voluminous documents. NMED's motion includes one exhibit, the entire 2016 Order. In deciding whether subject matter jurisdiction exists, the Court need not attach presumptive truthfulness to the facts alleged in the Second Amended Complaint and may consider all the attached exhibits without converting the motions to motions for summary judgment.

In the alternative, NMED and LANS move this Court to dismiss Counts III, IV, V, and VI of the Second Amended Complaint under 12(b)(6). To the extent that this Court finds that subject matter jurisdiction exists over these Counts, the Court's consideration of the 12(b)(6) motion will be limited to the pleadings and to exhibits that are incorporated by reference in the

Second Amended Complaint or ones that are central to the Second Amended Complaint and authentic, or matters of which the Court may take judicial notice.

### B. Standing

LANS asserts that Plaintiff lacks standing to bring this lawsuit. "Standing doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1182 (10th Cir. 2012). The standing requirement comes from the requirement in Article III of the United States Constitution that a "case or controversy" exist before a federal court can hear a case. U.S. Const. art. III, § 2, cl. 1. "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Wyoming v. United States Department of Agriculture*, 414 F.3d 1207, 1212 (10th Cir. 2005). An organization can sue based on injuries to itself or to its members. *See United Food and Commercial Workers v. Brown Group*, 517 U.S. 544, 577 (1996).

In this case, Plaintiff seeks to represent the interests of its members. Accordingly, the Court must determine whether Plaintiff meets the requirements for standing to bring a RCRA citizen suit on behalf of its members against Defendants. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). To satisfy the first requirement for associational standing – that an individual member of the association has standing to sue in their own right – a plaintiff must show that at least one individual member of that association meets the following requirements: (1) he or she has

"suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) his or her injury is "fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that [his or her] injury will be redressed by a favorable decision." *Laidlaw,* 528 U.S. at 180–81 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). LANS disputes all aspects of the associational and individual standing requirements. However, the two requirements that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Laidlaw,* 528 U.S. 167, 181 (2000), are handily met. First, Plaintiff's mission is to promote environmental protection and cleanup at nuclear facilities and thus its interest in filing this lawsuit is germane to its purpose. Second, LANS has made no argument that this lawsuit would require the participation of any individual member of Nuclear Watch.

Concerning injury in fact, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw,* 528 U.S. at 183. Here, Plaintiff has shown injury in fact by maintaining that Mr. Coghlan, its executive director, hiked and rock climbed in the adjacent national monuments, forests, and towns, and that his ability to do so has been impaired by LANS' and DOE's discharge of legacy waste into downstream canyon and its streambeds. This sort of recreational impairment constitutes injury in fact.

The next question is whether Plaintiff's injury is fairly traceable to LANS' and DOE's conduct. To satisfy the traceability requirement, the defendant's conduct must have caused the injury. *Lujan*, 504 U.S. at 560. Plaintiff contends that a variety of dangerous pollutants from the Laboratory's legacy waste are contained in a downstream canyon and its intermittent streambed,

that water supply wells in Los Alamos County and on San Ildefonso Pueblo property withdraw water from the regional aquifer beneath the Pajarito Plateau, and Mr. Coghlan stopped climbing in the area immediately adjacent to the Laboratory because of the area's dangerous quality. The 2005 Order itself states that DOE and the Regents of the University of California "have discharged industrial wastewater and other waste from outfalls into many of the canyon systems at the [Laboratory]." Doc. 51-1, p. 6. These facts sufficiently demonstrate that Mr. Coghlan's injury is fairly traceable to DOE's and LANS' actions. Plaintiff has standing.

To analyze the redressability requirement of standing, the Court next examines the interrelated doctrine of mootness.

**C. Mootness**

Constitutional mootness, "like standing, is a jurisdictional doctrine originating in Article III's 'case' or 'controversy' language." *WildEarth Guardians*, 690 F.3d at 1181-82. "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation; thus, courts have sometimes described mootness as 'the doctrine of standing set in a time frame.'" *Id.* The defendant bears the burden to show mootness. *Id*. at 1183. "[M]ootness doctrine is subject to an exception that sometimes allows courts to retain jurisdiction even if one or more of the elements of standing is lost; namely, when defendant's allegedly unlawful activity is capable of repetition, yet evading review." *Id.* at 1182-83. "Such situations arise, for example, when a plaintiff has been subjected to multiple instances of unlawful action in the past, and can demonstrate a likelihood of future repetition." *Id.* at 1183.

In *Rio Grande Silvery Minnow*, 601 F.3d 1096, 1111 (10th Cir. 2010) the Tenth Circuit addressed whether the plaintiffs' claims under the Endangered Species Act challenging two

Biological Opinions issued by Fish and Wildlife Service were mooted by the Fish and Wildlife Service's issuance of superseding Biological Opinion. The plaintiffs sought a declaration that the FWS and another federal agency violated the Endangered Species Act by failing to fully consult with each other about decision making activities before issuing two previous Biological Opinions, and also sought an injunction ordering the agencies to consult with each other. *Id*. at 1107. However, while the litigation was ongoing, FWS issued another Biological Opinion that superseded the previous Biological Opinions and that "establishe[d] a new regulatory framework under which" the federal agencies did not have to consult in the manner mandated by the previous Biological Opinions. *Id*. at 1118. Recognizing that "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies," *id*. at 1117, the Tenth Circuit held that it was "not situated to issue a *present* determination with real-world effect because those regulations no longer are operational—for all material purposes, they no longer exist." *Id*. at 1113.

The *Rio Grande Silvery Minnow* court relied extensively on a previous Tenth Circuit case, *Wyoming,* 414 F.3d at 1212 to support its reasoning that an agency's amendment of a challenged policy can moot an attack on that policy. In that case, the State of Wyoming challenged a rule issued by the United States Forest Service that prohibited certain road construction, reconstruction, and timber harvesting within the National Forest System lands. *Id*. at 1210. Wyoming also alleged that the rule was unlawfully promulgated. *Id*. at 1211. While the litigation was ongoing, however, the Forest Service then replaced the challenged rule with a new one, and the new rule abandoned the old one's prohibitions on road construction, etc., and established a new rule making process. *Id.*. On appeal, the Tenth Circuit dismissed Wyoming's challenge to the old rule, holding that "the new rule has mooted the issues in th[e] case," because

the challenged portions no longer existed and that "the alleged procedural deficiencies of the [old rule]" that Wyoming contested "are now irrelevant because the replacement rule was promulgated in a new and separate rulemaking process." *Id.* The court declined "to render a decision on the validity of the now nonexistent [old rule]" since to do so "would constitute a textbook example of advising what the law would be upon a hypothetical state of facts rather than upon an actual case or controversy as required by Article III of the Constitution." *Id.* at 1212-13.

### i. Plaintiff's Requests for Injunctive and Declaratory Relief are Moot

Plaintiff points out that the 2005 Order anticipated citizen lawsuits such as this one because it expressly incorporated the RCRA citizen suit enforcement provisions, stating that "each requirement of this Consent Order is an enforceable 'requirement' … of RCRA within the meaning of" § 6972(a)(1)(A). *See* Doc. 51-1, p. 20. The problem, though, is that the 2005 Order is gone because the 2016 Order replaced it. As in *Wyoming*, the challenged "portions of the [2005 Order] that were substantively challenged … no longer exist," 414 F.3d at 1212, thereby mooting Plaintiff's request for injunctive and declaratory relief under that order. The 2016 Order expressly stated that it "supersede[d] the 2005 Compliance Order on Consent (2005 Consent Order) and settle[d] any outstanding alleged violations under the 2005 Consent Order." Compl. Doc. 42, ¶ 51. Because consent orders are generally "to be construed for enforcement purposes basically as a contract," meaning that "the terms of the decree and the respective obligations of the parties must be found within the four corners of the consent decree," *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 194 (10th Cir. 1993), the superseding 2016 Order altered the parties' obligations by means of a campaign approach that does not follow the remediation schedule in the 2005 Order that is the basis of Plaintiff's lawsuit.

Plaintiff argues that citizen suits can proceed against a state enforcement agency if the agency improperly uses a consent decree to dispense with public participation requirements needed to modify a permit. *See Citizens for a Better Environment–Cal. v. Union Oil Co. of Cal. (UNOCAL),* 83 F.3d 1111, 1120 (9th Cir.1996) (state enforcement agency's attempted modification of permit with consent order ineffective when agency failed to comply with federal and state regulations govern[ing] the modification of … permits"); *Proffitt v. Rohm & Haas,* 850 F.2d 1007, 1012 (3d Cir.1988) (stay of enforcement of permit conditions void because there was "no opportunity for public participation" and the applicable regulations did not "permit dispensing with public notice when an amendment effects a substantial change in the terms of a permit"); *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 345–46 (S.D.N.Y. 2009) ("[a]n action alleging violations of the [Clean Water Act] cannot be dismissed where the state enforcement agency, acting without the benefit of public input, attempts to modify a permit.")

However, this is not a case of permit modification. This is a case of one consent order replacing another. The record does not show, and Plaintiff has not alleged, that Defendants attempted to modify DOE's hazardous waste permit without the public participation required for a formal permit modification. This case is not analogous to those cases previous cited where it was found that defendants circumvented public participation requirements for modifying binding permit by means of consent orders. In this case, Plaintiff' based its claims on alleged violations of the 2005 Order itself – which Plaintiff has not alleged is a permit – along  with what Plaintiff perceives as DOE's and NMED's non-compliance with the 2005 Order's modification rules that required public participation. But as in *Wyoming*, any "alleged procedural deficiencies" involving the 2005 Order's modifications are now "irrelevant because the replacement rule [*i.e.* the 2016 Order] was promulgated in a new and separate rulemaking process." 414 F.3d at 1212.

Thus, Plaintiff's argument that the 2016 Order could not have superseded the 2005 Order because it did not comply with the 2005 Order's modification rules fails because those rules no longer exist.

In a different vein, Plaintiff cites another line of authority to argue that the 2016 Order did not render its citizen suit moot because Plaintiff seeks remedies outside of the 2005 Order's scope. For example, the court in *Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. #1*, 16 F. Supp. 3d 294, 325–26 (S.D.N.Y. 2014) held that the defendant's compliance with a 2006 consent order regulating sewage discharges did not moot the plaintiffs' Clean Water Act citizen lawsuit where the plaintiffs asserted violations that were not covered by the 2006 consent order and thus outside of its scope. *See id.* at 325. Other courts have similarly found that "consent orders do not preclude citizen suits under RCRA, where the consent order did not remediate all of the harm." *Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co.*, 91 F. Supp. 3d 940, 957 (S.D. Ohio 2015) (EPA consent order to reduce quantity of hazardous wastes in water did not moot plaintiff's lawsuit where plaintiff sought remediation of contaminated property); *Cmty. Ass'n for Restoration of the Env't, Inc. v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1160 (E.D. Wash. 2013) (noting that "relief may be available when a government plan does not address the same substance or activity, or where there is ample room for injunctive relief beyond [the agency's] efforts."); *A–C Reorg. Trust v. E.I. DuPont de Nemours & Co.,* 968 F.Supp. 423, 430–31 (E.D. Wis. 1997) (RCRA claim regarding groundwater contamination not moot where EPA consent order only covered surface contamination). Here, however, Plaintiff identifies no violations independent of the 2005 Order's remediation schedule. That order is gone. Plaintiff's claims for injunctive and declaratory relief are moot.

Accordingly, the Court must determine what relief, if any, remains available to Plaintiff based on Defendants' alleged violations of the 2005 Order or the alleged invalidity of the 2016 Order. "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw,* 528 U.S. 167, 185 (2000). "Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit." *Rio Grande Silvery Minnow*, 601 F.3d at 1109. "[I]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Id*. at 1109-1110. "The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Id*. Because the Court concludes that the 2016 Order moots Plaintiff's claims for injunctive and declaratory relief based on the 2005 order, there essentially is no declaratory or injunctive relief for the Court to order. *See id.* at 1111-12 ("We must conclude that the [Fish and Wildlife Service's] issuance of the 2003 [Biological Opinion] mooted the Environmental Groups' prayer for both injunctive and declaratory relief. If we issued an injunction directing [Bureau of] Reclamation to consult concerning the biological opinions at issue in this litigation, it would have no effect in the real world because those biological opinions have been superseded.") To the extent that Counts I – VI of Plaintiff's Second Amended Complaint seeks declaratory and injunctive relief declaring the 2016 Order invalid and ordering LANS and DOE to comply with the 2005 Order, those counts are dismissed.[4]

---

[4] LANS and DOE assert that following the 2016 Order's supersession of the 2005 Order, any remaining challenges to the 2016 Order's validity or the manner in which it was executed are questions of state law that Plaintiff should have addressed to the New Mexico Court of Appeals – the court with direct reviewability of decisions by NMED's Secretary. *See* N.M. Stat. Ann. § 74-4-14. Essentially LANS and DOE contend that Plaintiff is without a federal cause of action under RCRA because the only RCRA-based mandate was the 2005 Order itself. They therefore contend that this Court lacks subject matter jurisdiction over Plaintiff's claims because the

Upon finding that Plaintiff's claims for injunctive and declaratory relief are moot, the Court next considers whether the doctrine of voluntary cessation applies. "One exception to a claim of mootness is a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time." *Rio Grande Silvery Minnow*, 601 F.3d at 1115. A party cannot "evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Id.* "In other words, this exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* "Courts therefore view voluntary cessation 'with a critical eye,' lest defendants manipulate jurisdiction to 'insulate' their conduct from judicial review." *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016).

"The plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time," a court should dismiss for lack of redressability. *WildEarth Guardians*, 690 F.3d at 1185. "But if the offending conduct ceases after the suit is filed, the defendant must establish mootness by showing that its offending

Complaint no longer presents any federal causes of action, nor does it invoke the Court's subject matter jurisdiction on the basis of diversity or supplemental jurisdiction. Rather, LANS and DOE assert that Plaintiff's Complaint presents only issues of state law that are not reviewable by this Court.

The Court does not agree. As explained *infra*, p. 31, a finding of mootness can prevent maintenance of a RCRA lawsuit for injunctive relief as long as there is no reasonable likelihood that the wrongful behavior will recur. But the mooting of injunctive relief will not moot a request for civil penalties. Therefore, Plaintiff's request for civil penalties for past violations of the 2005 Order makes this a federal case actionable under RCRA. Concerning LANS' and DOE's argument that Plaintiff could have but did not challenge the 2016 Order's validity in the New Mexico Court of Appeals, while this appears correct it is not germane to this Court's subject matter jurisdiction over Plaintiff's request for civil penalties for Defendants' alleged past violations of the 2005 Order. Even if Plaintiff had challenged the 2016 Order and its manner of execution in the New Mexico Court of Appeals, such a challenge would not affect its federal RCRA claims in this Court for civil penalties for alleged past violations of a RCRA-based mandates. It is undisputed that the 2005 Order was a RCRA-based mandate.

conduct "could not reasonably be expected to recur." *Id.* at 1185-86. This is a "formidable burden" on the defendant's part. *Brown*, 822 F.3d at 1167. "But the burden is not insurmountable, especially in the context of government enforcement. In practice, [this] heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Id.* "Most cases that deny mootness following government officials' voluntary cessation rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways." *Id.* (emphasis in original).

In *Rio Grande Silvery Minnow*, 601 F.3d at 1118 the Tenth Circuit concluded that there was no reasonable expectation that the alleged violation in that case – a federal agency's consulting process – would recur because a superseding order "established a new regulatory context" for the agency's consulting process. Here, Counts I-IV of Plaintiff's Second Amended Complaint allege violations stemming from task deadlines under the 2005 Order that have been altered by the issuance of the 2016 Order that uses a different approach to accomplish waste clean-up at the Laboratory. As in *Rio Grande Silvery Minnow*, the Court is not presented "with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease." *Id.* It contains enforceable milestones for numerous corrective actions. In *Rio Grande Silvery Minnow*, the court could "identify no lingering effects from the federal agencies' alleged violations" concerning their decision making process based on previous biological opinions, because those opinions were superseded and replaced. Similarly, the 2005 Order is superseded and replaced by the 2016 Order that contains a different remediation schedule. The voluntary cessation exception of the mootness doctrine does not apply.

### ii.     Plaintiff's Requests for Civil Penalties are not Moot

That leaves the portions of Counts I and II – Plaintiff's request for civil penalties against Defendants LANS and DOE for their failure to complete 13 corrective tasks under the 2005 Order, making them liable for a maximum penalty of $37,500 per day for each of its violations of RCRA.[5] In *Laidlaw*, the Supreme Court held that civil penalties "serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation." *Laidlaw,* 528 U.S. at 174. A defendant's cessation of illegal conduct following the filing of a lawsuit "ordinarily does not suffice to moot a case" because civil penalties still deter future violations. *Id; accord WildEarth Guardians*, 690 F.3d at 1186 (stating that "in most citizen suits, a plaintiff's claim for civil penalties is not rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations."). Therefore, post-lawsuit compliance may moot claims for injunctive relief, but district courts can still impose civil penalties for violations that have already taken place. *Laidlaw*, 528 U.S. at 192. Only when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will events following the filing of a suit moot a claim for civil penalties. *Id.* at 189.

In *WildEarth Guardians*, the Tenth Circuit addressed the "rare exception" where a defendant's later compliance with the law mooted a plaintiff's claim for civil penalties. The defendant, a public utility company, was initially compliant with all applicable laws when construction of its power plant began. But then a decision of the District of Columbia Circuit Court of Appeals required regulators to impose additional Clean Air Act requirements on power plant construction, thereby making the defendant non-compliant with the law. *Id.* at 1178. After the decision, the defendant worked with the relevant state agencies to comply with the modified

---

[5] District courts independently assess the amount of penalties on violators under RCRA and are not bound by a plaintiff's requested relief. *See Ekco Housewares, Inc.,* 62 F.3d at 814.

regulatory regime while construction of the plant continued. Noting that "in most citizen suits, a plaintiff's claim for civil penalties is not rendered moot by the defendant's compliance with the law because the plaintiff retains a concrete interest in deterring the defendant from future violations," *id.* at 1186, the Tenth Circuit nevertheless found that the defendant's actions did "not suggest a likelihood of future unlawful conduct needing to be deterred" because the defendant had previously gone above and beyond what was required in attempting to accommodate environmental interests, its non-compliance was due to events outside of its control (the D.C. Circuit's opinion), and the defendant did not have a "history or pattern" of violations, and the particular violation alleged was unlikely to be repeated. *Id.* at 1186–87.

At this stage, the Court cannot say that LANS and DOE have carried their "formidable" burden to show that it is "absolutely clear that its conduct" challenged here could not reasonably be expected to recur. Here, "the alleged wrongful behavior," *Laidlaw*, 528 U.S. at 189, at issue is LANS' and DOE's failure to complete 13 remediation tasks described in Counts I and II under the 2005 Order that have remained unfinished since either 2014 or 2015. Those tasks include submitting numerous remedy completion reports, investigation reports, work plans, and installing two groundwater monitoring wells to address groundwater contaminants and toxic pollutants at and around the Laboratory. According to Plaintiff, many of these tasks went unfinished because of LANS' and DOE's pattern of delaying. Although LANS contends that by 2012 NMED avoided enforcing the 2005 Order because the parties viewed it as increasingly inefficient, Plaintiff has sufficiently alleged that as late as 2014 and 2015, NMED *was* enforcing the 2005 Order against LANS and DOE, finding no good cause to extend certain deadlines, thus setting them apart from the defendant in *WildEarth Guardians* that had previously gone above and beyond what was required in attempting to accommodate environmental interests.

LANS and DOE contend that the 2016 Order's campaign approach makes violations of the sort Plaintiff complains unlikely to recur, but both fail to explain how this is so. DOE contends that under the 2016 Order each campaign has "units," which are discrete corrective tasks with projected completion dates. There are 1,395 units in all. However, DOE does not explain if any one of these units or campaigns address the specific corrective actions Plaintiff complained of in Counts I and II. Indeed, DOE has provided virtually no clarity on whether the 2016 Order even addresses Plaintiff's grievances at all. It is not the Court's job to pore through the numerous units in the record to determine if any of them address those violations. LANS argues in a similarly conclusory manner that the 2016 Order's new campaign approach, backed by NMED's enforcement power "ameliorates the concern that DOE will miss future deadlines and militates against speculating about future violations." But like DOE, LANS also fails to explain how the 2016 Order will abate the specific violations Plaintiff identified. It is theoretically possible that under the 2016 Order's campaign approach, which prioritizes remediation tasks based on risk, resources, and geography, the violations Plaintiff identified could, say, be deemed low-risk or want for resources, and thus remain uncorrected under the campaign approach.

Essentially, LANS and DOE have done nothing more than tell the Court that a new system is in place, have described its general workings, and promised that violations will not recur. But their legal and factual analysis purporting to show that the 2016 Order ensures that the specific grievances Plaintiff identified in Counts I and II are unlikely to recur is inadequate. They have failed to carry their formidable burden to show that this case is the rare exception where a defendant's compliance with the law moots a plaintiff's claim for civil penalties. Defendants' motions to dismiss Plaintiff's claims for civil penalties as to Counts I and II are denied.

### F. Abstention

LANS argues, in the alternative, that the Court should abstain from exercising jurisdiction in this case. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Given the narrowness of the abstention doctrine and given that DOE and LANS have inadequately explained how the 2016 Order makes violations of the sort Plaintiff complained of unlikely to recur, the Court believes that a ruling on abstention would be premature. Without sufficiently knowing how the 2016 Order impacts Plaintiff's specific grievances and requested relief, the Court cannot weigh the factors bearing on abstention.

**IT IS THEREFORE ORDERED** that Intervenor New Mexico Environment Department's Second Motion to Dismiss **[Doc. 45]**, Defendant United States Department of Energy's Motion to Dismiss the Second Amended Complaint **[Doc. 47]** and Defendant Los Alamos National Security, LLC's Motions to Dismiss Plaintiff's Second Amended Complaint or Alternatively for Court Abstention **[Doc. 48]** are **GRANTED** in part and **DENIED** in part as follows:

1. To the extent that Counts I – VI of Plaintiff's Second Amended Complaint seeks declaratory and injunctive relief, Defendants' motions to dismiss are **GRANTED**;

2. To the extent that Counts I – II of Plaintiff's Second Amended Complaint seeks civil penalties, Defendants' motions to dismiss are **DENIED**.

3. **IT IS SO ORDERED**.

_____
United States District Court Judge