# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

NUCLEAR WATCH NEW MEXICO,

      Plaintiff,

v.                                   No. 1:16-cv-00433-JCH-SCY

UNITED STATES DEPARTMENT
OF ENERGY and LOS ALAMOS
NATIONAL SECURITY, LLC,

      Defendants,

and

NEW MEXICO ENVIRONMENT
DEPARTMENT

      Intervenor.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the following five motions: (i) Intervenor New Mexico Environment Department's Motion for Summary Judgment on Counts I and II of Plaintiff's Second Amended Complaint (ECF No. 91); (ii) Plaintiff Nuclear Watch New Mexico's "Motion for Partial Summary Judgment against the United States Department of Energy (ECF No. 92); (iii) The United States Department of Energy's Opposed Motion for Summary Judgment (ECF No. 101); (iv) Plaintiff's Motion for Partial Summary Judgment against Los Alamos National Security, LLC (ECF No. 94); and (v) Defendant Los Alamos National Security, LLC's Motion for Summary Judgment (ECF No. 96).

## I.      Introduction

In this Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.,* (RCRA) citizen lawsuit, Plaintiff contends that the United States Department of Energy (DOE) and Los Alamos National Security, LLC, (LANS) a private contractor, are jointly liable for unresolved corrective tasks under a 2005 consent order (2005 Order) governing legacy hazardous waste clean-up at Los Alamos National Laboratory. *See* Pl.'s Second Am. Compl., ECF No. 42.

In a previous Memorandum Opinion and Order, the Court granted in part the Defendants' and Intervenor's Fed. R. Civ. P. 12(b) motions and dismissed as moot Plaintiff's claims for injunctive and declaratory relief. Specifically, the Court held that a new consent order (2016 Order) superseded the 2005 Order on which Plaintiff's complaint was based. But the Court also held that the issuance of the 2016 Order did not automatically moot Plaintiff's civil penalty claims.

Now, Defendants and NMED have moved for summary judgment, renewing their argument that Plaintiff's civil penalty claims are moot. Plaintiff has cross-moved for summary judgment against the Defendants, maintaining that they are liabile for RCRA violations and civil fines. After carefully considering the motions, briefs, evidence, relevant law, and being otherwise fully-informed, the Court **GRANTS** LANS's motion for summary judgment, but **DENIES** all other parties' motions.

## II.  General Statutory and Regulatory Overview

Because this case concerns the Defendants' alleged compliance with a RCRA-based mandate, it makes sense to briefly review the RCRA and corresponding laws of the New Mexico Hazardous Waste Act, N.M. Stat. Ann. §§ 74-4-1 – 74-4-14 (NMHWA). The RCRA governs the treatment, storage, and disposal of solid and hazardous waste. *See Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 331–32 (1994). Section 3006 of RCRA, 42 U.S.C. § 6926(b), allows the states to develop hazardous waste programs at least as stringent as RCRA, subject to authorization by the

Administrator of the Environmental Protection Agency. Consistent with RCRA's delegation of authority to the states, in 1985 the State of New Mexico received EPA authorization to implement its hazardous waste program in lieu of the federal program. Intervenor NMED provides hazardous waste permits to owners or operators of hazardous waste facilities such as LANS and DOE to treat, dispose, and store waste. *See* N.M. Stat. Ann. 74-4-4.2. NMED also has enforcement capabilities against a person who violates the NMHWA or a condition of a permit issued under the NMHWA, and can issue compliance orders, civil penalties, or enjoin a permit violator. *See id.* § 74-4-10(A)(1)-(2).

With regard to citizen suit enforcement, RCRA's "violation" provision allows any person to commence a lawsuit against any other person or entity "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to [RCRA]." 42 U.S.C. § 6972(a)(1)(A). These types of lawsuits are known as "permitting violation claims." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 504–05 (4th Cir. 2015). As relevant here, they may be brought "against a defendant who is alleged 'to be [currently] in violation' of a RCRA-based mandate, regardless of any proof that its conduct has endangered the environment or human health. The permit, etc., subject to suit under subsection (a)(1)(A) can be either a state or federal standard that became effective pursuant to RCRA." *Id.* at 504 (citing § 6972(a)(1)(A)). Citizen suits are meant "to supplement rather than supplant government action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 60 (1987).

In hearing citizen RCRA suits, district courts have statutory authority to grant various types of equitable relief necessary to address the violation or endangerment, as well as to impose civil penalties. 42 U.S.C. § 6972(a). *See Davis v. Sun Oil Co.*, 148 F.3d 606, 611 (6th Cir. 1998) ("civil

penalties payable to the United States may be awarded in a citizen suit brought under § 6972(a)."); *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 28 (1st Cir. 2011) ("[i]n hearing suits under [§ 6972(a)], district courts have statutory authority to … impose civil penalties."); *Clorox Co. v. Chromium Corp.*, 158 F.R.D. 120, 128 (N.D. Ill. 1994); *City of Evanston v. N. Illinois Gas Co.*, 229 F. Supp. 3d 714, 725 (N.D. Ill. 2017) ("a plaintiff suing under § 6972(a)(1)(A) can allege a violation of any 'permit, standard, regulation, condition, requirement, prohibition, or order' effective pursuant to subchapter III, in which case § 6972(a) would allow the plaintiff to seek civil penalties under § 6928(a) or (g)."). Any civil penalty imposed on a violator must be paid to the United States Treasury and not to the plaintiff who instituted the suit. *See Gwaltney,* 484 U.S. at 52.

## III.    Factual Background

<u>The 2005 Order</u>

The Laboratory designs and tests nuclear weapons, produces plutonium pits, researches and tests high explosives and material science, designs lasers, and engages in photographic processing. Pl.'s Second Am. Compl., ¶ 27, ECF No. 42. As a result of these operations, the Laboratory and has "generated," "treated," "stored," "disposed of," and otherwise "handled" hazardous waste as defined by RCRA. *Id.* ¶ 34.   Since 1943, DOE and LANS (and their predecessors) have disposed of hazardous waste in septic systems, pits, surface impoundments, trenches, shafts, landfills, and waste piles at the Laboratory. *Id.* ¶¶ 34-35. As a result, DOE and LANS have discharged hazardous waste in industrial wastewater and other waste from outfalls into many of the canyon systems under the Laboratory. *Id.* ¶ 35.

In May 2002, NMED determined that the presence of hazardous waste at the Laboratory presented an imminent and substantial endangerment to health or the environment, and ordered a

series of corrective tasks at the Laboratory. 2005 Consent Order, ECF No. 51-1 at 9. This culminated with NMED, DOE, and the Regents of the University of California (LANS's predecessor) entering into the 2005 Order in March 2005. The 2005 Order was modified twice, on June 18, 2008, and on October 29, 2012, to make agreed-upon changes to completion dates and other revisions. DOE's MSJ, Undisputed Fact ("DOE's UF") ¶ 1. In 2006, LANS got the contract to manage, operate, and remediate legacy waste at the Laboratory. LANS's MSJ, Undisputed Fact ("LANS's UF") ¶ 1. LANS was formed for the sole purpose of managing and operating the Laboratory and has no other business activity. LANS's UF ¶ 3.

Under the 2005 Order, the process of performing corrective actions for hazardous waste clean-up typically involved a series of progressive steps. Rhodes Decl. ¶ 5, ECF No. 101-2. Investigators assessing a site known or believed to contain hazardous waste would gather information about the site in what was called a RCRA Facility Investigation (RFI). *Id*. The RFI included preparation of an "Investigation Work Plan" (IWP), which was a detailed plan that the facility owner/operator develops and follows throughout the RFI. *Id*.

Following the submission of an IWP, the results of investigations were reported in RFI reports or "Investigation Reports." *Id*. Investigation Reports identified the corrective action activities for areas that were the subject of the RFI and indicated whether performance of a Corrective Measure Evaluation was necessary. *Id*. If corrective measures were necessary, those measures were documented in a Remedy Completion Report (RCR). *Id.* The 2005 Order reflected this typical approach to the corrective actions process, mandating a progressive series of actions to be performed and documents to be submitted. *Id*.

The 2005 Order required investigation efforts of individual Technical Areas (TAs), which are administrative areas established to encompass operations at the Laboratory. *Id*. ¶ 6. To assist

in organizing the effort, DOE would submit a list of "Aggregate Areas," which means an area in a single watershed or canyon in which one or more Solid Waste Management Units (SWMUs) and Areas of Concern (AOCs) are located. *Id.* An SWMU generally means a place where solid waste has been placed at any time and there may be a risk of release of hazardous waste or haste waste constituents. *Id.* Areas of Concern refer to a place having a known or suspected release of hazardous waste or hazardous waste constituents not traceable to an SWMU. *Id.*

The 2005 Order established a strict schedule for completing specific corrective action tasks for the investigation and clean-up of environmental contamination at the Laboratory. *Id.* ¶ 8. The 2005 Order also contained provisions governing how DOE and LANS could request a time extension from NMED to comply with corrective action. *Id.* Specifically, the Defendants would have to show good-cause for an extension request in a letter to NMED. *Id.* NMED then had ten days to respond; if NMED did not respond in that period, then the request was automatically granted. *Id.* The schedule of "deliverables" under the 2005 Order specifically set an overall initial completion date of December 6, 2015 for all elements of the 2005 Order. DOE's UF ¶ 2. But this date did not contemplate or account for extension deadlines in the manner just described. Rhodes Decl. ¶ 8.

### The 2012 Framework Agreement

Two relevant events occurred in 2011. First, Congress, which appropriates legacy waste clean-up remediation funds each year, stated in a report accompanying energy and water development funding for fiscal year 2012 that DOE "ha[d] yet to develop a comprehensive plan for cleanup of legacy waste at Los Alamos National Laboratory," and cut funding from 2011 fiscal year levels. H.R. Rep. No.112-118, at 146; Swavely Decl. ¶ 7, ECF No. 117-2. The report explained that "the total cost of cleanup remains uncertain, particularly for soil and ground water

remediation. The Department [of Energy] should focus on site planning to develop more detailed disposition and restoration strategies before significantly ramping up its cleanup activities there." H.R. Rep. No.112-118.

Second, as a result of the Las Conchas wildfire in 2011, former New Mexico Governor Susana Martinez requested that DOE change some priorities under the 2005 Order. DOE agreed to this request and, in 2012, NMED and DOE entered into a non-binding Framework Agreement that realigned priorities. DOE's UF ¶ 3. NMED and DOE agreed to prioritize removing 3706 cubic meters of above-ground transuranic waste at Technical Area or TA-54, and to focus Laboratory remediation on accelerating the off-site shipment and disposition of this material at the earliest feasible time. LANS's UF ¶ 16. This became known as the "3706 Campaign." Erickson Decl., ECF No. 98 ¶ 5.

As a result, over the next several years DOE diverted significant resources from the 2005 Order to removing the transuranic waste. LANS's UF ¶ 17. During this period, NMED approved extensions for the 2005 Orders deadlines because the available funding for corrective actions was needed to perform the removal of the non-cemented above-ground legacy waste, which was the highest priority. Rhodes Decl. ¶ 11.

In February 2014, a radiological release of radioactive material occurred at DOE's Waste Isolation Pilot Plant, a salt bed located beneath the earth's surface in southeastern New Mexico. *Id*. ¶ 12. The cause of the release was a waste drum from the Laboratory. *Id*. All waste processing and shipment at the Laboratory stopped, and DOE was unable to meet the completion dates for the Framework Agreement's milestones. *Id*.

Because the WIPP incident impaired DOE's inability to conclude the Framework Agreement on time, NMED began denying DOE's request for extensions of the 2005 Order's

deadlines. *Id.* In 2014, for example, NMED denied further deadline extensions for Defendants to complete investigation reports at three Aggregate Areas identified in Plaintiff's Second Amended Complaint and to install Well R-65. *See* ECF Nos. 108-12, 108-19, 108-24, 108-27, 108-29; *see also* Pl.'s Resp. Br., ECF No. 119 at 25. In letters to Defendants explaining why it was denying their deadline extension requests, NMED told Defendants that

> NMED has granted extensions based on the [Defendants'] need to divert resources to remove transuranic waste in accordance with the Framework Agreement. Based on the [Defendants'] statement that they will not be able to meet the deadlines that they committed to in the Framework Agreement, the [deadline extension] request is hereby denied.

NMED sent March or April 2015 letters to Defendants in which NMED "formally declared its intent to assess stipulated penalties" under the 2005 Order for Defendants' failure to file investigation reports for four canyon Aggregate Areas – Cañon de Valle, Upper Water Canyon, Starmer/Upper Pajarito, and Chaquehui Canyon. *See* ECF Nos. 108-30, 108-34, 108-38, 108-48.

### The Bridge Contract between DOE and LANS

At some point, DOE decided to hire a new legacy waste clean-up contractor. Erickson Decl. ¶ 13, ECF No. 98. Because the process of hiring a new contractor was anticipated to take one to two years, DOE and LANS entered into the "Bridge Contract" in September 2015. *Id.*; LANS's UF ¶ 18. That contract outlined legacy waste clean-up activities to be performed until a successor remediation contractor could be hired. *Id.* The contract defined LANS's remediation responsibilities "to the extent the work is funded by DOE," and did not authorize LANS to accomplish work to meet deadlines under the 2005 Order. LANS's UF ¶¶ 20-21.

In addition, the Bridge Contract addressed the timing of Aggregate Area investigations at the Laboratory. Erickson Decl. ¶ 16. As for two Aggregate Areas identified in Plaintiff's Second Amended Complaint – the Lower Water Canyon and Twomile Canyon Aggregate Areas – the

Bridge Contract established deadlines for LANS to complete investigation work plans and reports for those two Aggregate Areas. *Id*. ¶¶ 16, 18. According to LANS, although these two Aggregate Areas were "within the [Bridge Contract] scope … the work product is preliminary to the work product that was specified in the 2005 Order." LANS's UF ¶ 23. As for six other Aggregate Area investigation deadlines identified in Plaintiff's Second Amended Complaint, work on those Aggregate Areas was not included within the scope of the Bridge Contract. *Id*. Also, the Bridge Contract did not include the preparation or submission of the Remedy Completion Report for Material Disposal Areas A or AB, which are violations alleged by Plaintiff in its Second Amended Complaint. LANS's UF ¶ 24.

The 2016 Order

As part of the earlier 2012 Framework Agreement negotiations, DOE and NMED agreed to renegotiate the 2005 Order. DOE's UF ¶ 4. DOE and NMED completed negotiations and executed a superseding consent order, the 2016 Order, on June 24, 2016. *Id*. LANS was not a party to the 2016 Order. LANS's UF ¶ 26.

Unlike the 2005 Order, the 2016 Order does not contain a predetermined specific schedule with enforceable deadlines for completion of all corrective action tasks at the outset. DOE's UF ¶ 4. Rather, the 2016 Order provides that NMED and DOE will meet annually to identify specific actions to be accomplished for the next federal fiscal year and assign enforceable (by means of fines and penalties) deadlines to those actions – referred to as "milestones." *Id*. In addition this annual negotiation identifies certain actions – referred to as "targets" – as being intended for the two fiscal years following the next fiscal year, but targets are not subject to enforceable deadlines. *Id*. This method for cleaning-up waste is referred to as the "campaign approach." Rhodes Decl. ¶ 16.

The 2016 Order accounts for the entire scope of work required by the 2005 Order, but uses the campaign approach just described. *Id*. Specifically, the 2016 Order addresses the requirements that Plaintiff has identified as alleged violations, but, consistent with the procedures of the 2016 Order, no milestone or target deadlines have yet been set for the vast majority of corrective tasks Plaintiff identified in its Second Amended Complaint. DOE's UF ¶ 5; Supplemental Rhodes Decl., ECF No. 132-1 ¶¶ 11-12.

As of the filing of DOE's motion for summary judgment, DOE has met the deadlines established under the 2016 Order, as modified by NMED-approved extensions. DOE's UF ¶ 6.

<u>LANS's Role at the Laboratory Ends</u>

Beginning on November 1, 2018, during the pendency of this litigation, a new contractor selected by DOE, Triad National Security, LLC, replaced LANS as the management and operating contractor for the Laboratory. LANS's UF ¶ 4. On October 31, 2018, LANS's role as the management and operating contractor for the Laboratory ended. LANS's UF ¶ 5. Because LANS was formed solely to manage and operate the Laboratory, and because that work is its only business activity, LANS closed its contract with DOE and is winding down its business. LANS's UF ¶ 6. LANS has no legacy waste clean-up work, or any work beyond closing its contract at the Laboratory. LANS's UF ¶ 7. As of November 1, 2018, LANS is no longer the co-permittee and co-operator on the RCRA-permit for the Laboratory. LANS's UF ¶¶ 8-10.

Apart from its management and operating role, LANS's waste remediation contract was given over to Newport News Nuclear BWXT – Los Alamos, LLC on May 1, 2018, and therefore LANS is no longer the legacy waste contractor at the Laboratory. LANS's UF ¶ 13. Accordingly, LANS has no responsibility for the selection, implementation, or timing of any remediation tasks, nor does it have any duty to meet remediation deadlines in the 2016 Order. LANS's UF ¶ 14.

<u>This Litigation</u>

In this lawsuit the Plaintiff, an advocacy organization dedicated to clean-up at nuclear facilities, alleged present violations[1] of RCRA by DOE and LANS for failing to complete 15 remediation tasks under the 2005 Order – specifically, to submit to NMED seven Investigation Reports of Aggregate Areas, two Remedy Completion Reports for Material Disposal Areas, and to install two monitoring wells and follow-up documentation associated with those wells.[2] The Court outlines the alleged 15 submissions that Defendants were supposed to make to NMED under the 2005 Order:

1. A Remedy Completion Report for Material Disposal Area (MDA) A at TA-21. DOE and LANS asked for, and NMED granted, a deadline extension three times, or until June 30, 2014 to complete this task. On June 18, 2014, NMED denied a fourth extension request to submit the Remedy Completion Report.

2. An Investigation Report for the Cañon de Valle Aggregate Area at TA-15. NMED extended the deadline twice at DOE's and LANS's request, thereby imposing a deadline

---

[1] *See Meghrig v. KFC Western, Inc*. 516 U.S. 479, 482, (1996) (noting that § 6972(a)(1)(A) claims require present violations because it does not apply to retroactive violations). At the time Plaintiff filed its original complaint, the 2016 Order had not yet become effective and therefore Plaintiff alleged ongoing RCRA violations. *See Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 151 (2d Cir. 2006) (district court erred in dismissing plaintiff's amended complaint on the ground that defendant obtained a water pollutant discharge permit by the time plaintiff filed its amended complaint because "the alleged violation had not ceased before the *initial* complaint was filed.") (emphasis in original).

[2] Plaintiff has not sought summary judgment for two additional alleged RCRA violations asserted in its Second Amended Complaint. Specifically, Plaintiff did not seek summary judgment against Defendants for their alleged failure to submit to NMED a Remedy Completion Report for MDA G and an Investigation Work Plan for the Lower Water/Indio Canyon Aggregate Area. *See* ECF No. 97 at 7 n.1; ECF No. 95 at 7. Accordingly, this Memorandum Opinion and Order does not address or evaluate those two alleged violations.

of July 2, 2014. LANS and DOE did not submit the report by this date, and on July 10, 2014, NMED denied a third extension request.

3. Installation of monitoring Well R-65 into the regional aquifer. NMED extended the deadline for completing Well R-65 until June 30, 2014. On June 25, 2014, NMED denied a request to extend the deadline for completing Well-65.

4. An accompanying Well Completion Fact Sheet describing the installation of Well-65 due within 30 days of Well-65's installation.

5. A Well Completion Report for Well-65 due 150 days after Well-65's installation.

6. An Investigation Report for the Lower Pajarito Canyon Aggregate Area due July 31, 2014.

7. An Investigation Report for the Twomile Canyon Aggregate Area due August 30, 2014, even though DOE had received from NMED two previous deadline extensions.

8. An Investigation Report for the Cañon de Valle Aggregate Area at TA-16 due December 15, 2014. NMED granted one deadline extension, but denied another. In a March 2015 letter NMED declared its intent to assess stipulated penalties against DOE for not submitting the Investigation Report.

9. An Investigation Report for the Upper Water Canyon Aggregate Area due December 31, 2014. NMED denied a second request for an extension to complete the Investigation Report and in a March 2015 letter NMED declared its intent to assess stipulated penalties against DOE for not submitting the Investigation Report.

10. An Investigation Report for the Starmer/Upper Pajarito Canyon Aggregate Area due December 31, 2014. NMED denied a second request to extend this deadline and in a March 2015 letter formally declared its intent to assess stipulated penalties for DOE's failure to file the Investigation Report.

11. Installation of monitoring Well R-26i into the intermediate perched aquifer by December 31, 2014. NMED denied a third request for the extension of the deadline for installing Well R-26i.

12. A Well Completion Summary Fact Sheet for Well R-26i within 30 days of installation.

13. A Well Completion Report for Well R-26i within 150 days of installation.

14. A Remedy Completion Report for MDA AB, Areas 1, 3, 4, 11, and 12 at TA-49 due February 3, 2015.

15. An Investigation Report for the Chaquehui Canyon Area due March 31, 2015. NMED denied a second request to extend this deadline and in an April 2015 letter formally declared its intent to assess stipulated penalties for DOE's failure to submit the Investigation Report.

DOE and NMED agree that DOE did not make the above submission to NMED as called for under the 2005 Order.[3]

## IV. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986). A fact is considered

---

[3] While DOE and NMED agree that the 15 submissions never occurred, LANS does dispute many of Plaintiff's underlying factual allegations and arguments. First, LANS contends that the 2016 Order mooted all of its obligations to perform any of these tasks. Second, it argues that its non-performance under the 2005 Order is excused by a number of contractual defenses, including the doctrines of excuse, prevention, impossibility, and intervening and superseding causes. *See* LANS's Resp. Br., ECF No. 117 at 30. In addition, LANS argues that Plaintiff's suit is barred by the doctrines of waiver and estoppel. The Court only rules on LANS's argument that Plaintiff's claims are moot since that issue is dispositive; the Court does not address or decide any other issue raised by LANS.

material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248–50. An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013). "At the summary judgment stage, non-movants … are given wide berth to prove a factual controversy exists." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005) (citation and quotation marks omitted).

If the moving party bears the burden of proof on its claims at trial, it must first affirmatively show that, on all the essential elements of his claims, no reasonable jury could find for the nonmovant. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J. dissenting). "Summary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Leone*, 810 F.3d at 1153 (citation and quotations omitted). The district court's role is to "assess whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *El Paso Gold Mines, Inc.*, 421 F.3d at 1150.

In analyzing cross-motions for summary judgment, a court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

## V. Discussion

### A. Mootness Legal Framework

"Under Article III of the Constitution, the power of the federal courts extends only to 'actual, ongoing cases or controversies.'" *Wyoming v. U.S. Dep't of Agr.*, 414 F.3d 1207, 1211–12 (10th Cir. 2005) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). "A case will be rendered moot if 'the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Wyoming*, 414 F.3d at 1211-12 (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

"One exception to a claim of mootness is a defendant's voluntary cessation of an alleged illegal practice which the defendant is free to resume at any time." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (citation omitted). "[T]his exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Id*. "Voluntary actions may, nevertheless, moot litigation if two conditions are satisfied: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979)).

The seminal case analyzing mootness in the context of a Clean Water Act citizen suit for civil penalties is *Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) where the Supreme Court reversed the Fourth Circuit's holding that a citizen suit seeking civil penalties was moot because the alleged CWA violations had ceased. *Id.* at 174. The Supreme Court held that a defendant's cessation of illegal conduct following the commencement of suit "ordinarily does not suffice to moot a case" because civil penalties "serve as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence the litigation." *Id.* And the Court reached this conclusion even though the polluting facility had been "permanently closed, dismantled, and put up for sale, and all discharges from the facility had permanently ceased." *Id.* at 179. Only when it is "absolutely clear," the Court held, "that the allegedly wrongful behavior could not reasonably be expected to recur" will events following the commencement of a suit moot a claim for civil penalties. *Id.* at 189. The Supreme Court believed that it was not clear whether the facility's Clean Water Act violations "could not reasonably be expected to recur," in part because the facility retained its pollutant discharge permit. *Id.* at 193-94, n. 6. "Although the defendant's obligation is to show it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, the Supreme Court has never suggested a defendant must make resumption of his conduct impossible." *Brown v. Buhman*, 822 F.3d 1151, 1167 (10th Cir. 2016). Citing *Laidlaw*, the Tenth Circuit noted that one of its cases was the "rare exception" where the plaintiff's claim for civil penalties was mooted by the defendant's later compliance. *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1186 (10th Cir. 2012). Defendants and Intervenor bear the burden of proving mootness: "In

seeking to have a case dismissed as moot ... the defendant's burden is a heavy one." *Gwaltney of Smithfield, Ltd.*, 484 U.S. at 66 (citation omitted).[4]

**B. Analysis**

**i. Plaintiff's Claims against DOE**

Defendants' and Intervenor's principal argument for mootness is that the 2016 Order superseded the 2005 Order by dramatically changing the compliance requirements for corrective clean-up. According to DOE, its "obligations under the 2016 Order are, in relevant respects, different from its obligations under the now-superseded 2005 Consent Order," thereby diminishing the likelihood of not meeting task deadlines. DOE's MSJ at 3. DOE explains that the 2016 Order allows it to perform corrective action without having to wait for NMED's approval, and that under the 2016 Order it can implement "presumptive remedies" for certain areas without having to fill-out a Corrective Measures Evaluation, a large-scale study evaluating the pros and cons of alternative corrective measures. DOE also explain that 2016 Order's method of setting enforceable milestones for the current fiscal year followed by two fiscal years of non-enforceable targets allows the parties to plan campaigns according to federal funding. NMED (without citing summary judgment evidence) similarly says that "[a]ll milestones and correlated deliverables still require

---

[4] LANS and DOE ask the Court to adopt out-of-circuit caselaw that would apply a more lenient standard for evaluating mootness where a defendant stops its offending conduct because of a consent decree. *See* LANS's MSJ at 21 (citing *Environmental Conservation Organization v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008) (stating that a "consent decree will moot the citizen suit, unless the citizen-plaintiff proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding [government enforcement].")). However, this "realistic prospect" standard, which conveniently shifts the burden to Plaintiff to prove its claims are no longer moot because of government ordered remedial measures, has not been adopted by the Tenth Circuit (as far as the Court knows). Without binding guidance, the Court adheres to the Supreme Court's decades-long rule that the parties claiming mootness – NMED, DOE and LANS – bear the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 203 (1968)).

approval by NMED," thereby making the 2016 Order a "more realistic, interactive scheduling process for cleanup." NMED's MSJ, ECF No. 91 at 6. DOE says that these aggregate changes represent a "changed context," that ensures that deadlines will not be missed. *See* DOE's MSJ at 14 (citing *Rio Grande*, 601 F.3d at 1118).

There is a genuine dispute of material fact about whether the 2016 Order represents an entirely changed context. First of all, the 2016 Order, like the 2005 Order, subjects DOE to its basic obligation to clean-up hazardous waste at the Laboratory. Just like the 2005 Order, the 2016 Order requires DOE to investigate Aggregate Areas and develop reports for Material Disposal Areas – things Plaintiff said it did not timely do under the 2005 Order. *See generally* Appendix C, ECF No. 101-3; Rhodes Decl. ¶ 24. In fact, except for the requirements to install the two wells, "the 2016 Consent Order addresses the [] requirements that Plaintiff[] [has] identified as alleged violations," DOE's UF ¶ 5, but repackages and spreads those tasks about into different campaigns, some of which are backed by milestones or targets, but most of which are not. *See id*; Supplemental Rhodes Decl. ¶¶ 10-13, ECF No. 132-1. A new compliance regime, even a stricter one (which DOE does not claim the 2016 Order is) does not necessarily moot a claim for civil penalties. *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) ("[t]here is no basis for believing that the bare fact of a new, stricter [CWA] permit makes future permit violations any less likely, deterrence any less necessary, or the deterrent effect of civil penalties any less potent."). DOE is the alleged violator in this case – the Court cannot simply accept at face value its witness' claim that the 2016 Order makes clean-up delays unlikely. To do so would be improperly deciding the cross-motions based on a credibility assessment that is reserved for the trier of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [functions

for the trier of fact], not those of a judge."). Because there is sufficient disagreement about whether the 2016 Order represents an entirely changed context such that DOE's will not miss deadlines, the Court, sitting as trier of fact, will simply have to weigh the parties' evidence.[5]

Next, Defendants argue that many of the extensions they sought under the 2005 Order were validly undertaken to comply with the 2012 Framework Agreement. LANS submits evidence that the 3706 Campaign became the "top cleanup priority," from 2012 to 2014; "the majority of DOE funding for legacy waste cleanup had been diverted to" that task; and that Defendants "had to stop work on many legacy cleanup tasks covered by the 2005 Order." Erickson Decl. ¶¶ 6, 10, 11. Indeed, the 2012 Framework Agreement specifically recognized that to address disposing of the highest risk aboveground transuranic waste, "some lower priority cleanup work cannot be completed (under the current budge conditions) as currently scheduled in the [2005] Consent Order." Framework Agreement at 3, ECF No. 98-1. LANS seems to suggest that the installation of Well R-26i – one of the violations identified by Plaintiff – was one such lower priority task for which it sought an extension to complete in December 2014. *See* Swickley Decl. ¶¶ 14-15, ECF No. 117-1. According to Defendants, the 2012 Framework Agreement obligations, combined with reduced federal funding, severely impaired their ability to complete clean-up tasks and the 2016 Order's use of the campaign approach allows the parties to consider federal funding shortfalls.

Plaintiff, though, submitted rebuttal evidence that NMED – which played the dual-role of Framework Agreement signatory and enforcer of the 2005 Order – denied further deadline extensions for Defendants to complete certain investigation reports and to install Well R-65 because they were not meeting the 2012 Framework Agreement's deadlines. As for Well R-65 in particular, NMED told DOE and LANS in a 2014 letter denying their request to push back

---

[5] The parties tell the Court that this case will be tried without a jury. *See* ECF No. 82 at 17.

installing the well that "Governor Martinez has prioritized the protection of groundwater, and any delay in completing installation of R-65 is counter to this objective." ECF No. 108-19. Plaintiff also submitted evidence that less than one year before the 2016 Order came into effect, NMED sent Defendants March or April 2015 letters declaring its intent to assess stipulated penalties under the 2005 Order for Defendants' failure to file investigation reports for four canyon Aggregate Areas that are now part of the 2016 Order's campaign approach. Moreover, Plaintiff submitted a congressional report that supposedly cut DOE's budget for 2012 because it had yet to develop a plan for clean-up of legacy waste. Again, the Court sitting as trier of fact will have to weigh this evidence in evaluating the degree to which DOE's non-compliance with the 2005 Order because of the Framework Agreement and budget shortfalls impacts the mootness question.

Finally, both Plaintiff and Defendants submitted evidence of what Plaintiff refers to as Defendants' alleged "pattern of delay." First, Plaintiff points out that DOE has violated other similar tasks under the 2005 Order that Plaintiff did not include in its Second Amended Complaint, including submitting remedy completion reports, investigation reports, and investigation work plans. *See* Pl.'s Resp. Br., ECF No. 119 at 20.[6] Second, Plaintiff says that DOE and LANS requested, and NMED, approved, more than 160 deadlines under the 2005 Order. Third, Plaintiff provides a website address that purports to show DOE's self-reported RCRA violations pursuant to the Laboratory's Hazardous Waste Facility Permit for fiscal years 2011 through 2017. Fourth, Plaintiff says that in March 2018, NMED notified DOE that it had not properly stored hazardous

---

[6] The Court does not understand the document cited by Plaintiff that purportedly shows these alleged violations. *See* Pl.'s Resp. Br., ECF No. 119 at 19 (citing "footnote 10, *infra*," and accompanying website). In its reply brief, DOE countered with no interpretation of the document Plaintiff relies on, saying instead that any additional alleged violations are irrelevant. Plaintiff will have to contextualize the document at trial, and the trier of fact will give it whatever weight it is due.

waste and finding that "[d]ue to the nature and severity of the violations above, and LANL's past history of noncompliance," and that NMED "will propose a civil penalty."[7] Fifth, Plaintiff submitted the declaration of Mr. Robert Alvarez. Mr. Alvarez – a former Senior Policy Adviser to the Secretary of Energy – opined that the 2016 Order will not end DOE's and its contractors' "noncompliance." Alvarez Decl. ¶ 9, ECF No. 119-1. Mr. Alvarez declared that the 2016 Order allows DOE to complete clean-up activities in the year 2036 and that DOE has assigned a probability of meeting the 2036 deadline as low as 50%. *See id.* ¶ 9(b). Mr. Alvarez also stated his belief that the campaign approach will increase the likelihood of clean-up delays at the Laboratory, relying on both his experience and reports from various governmental and non-governmental organizations that have allegedly criticized DOE's or the Laboratory's clean-up efforts. *See id. e.g.* ¶¶ 10(a), 12, 13.

DOE argues that much of this evidence is irrelevant. To start, DOE says that Plaintiff is referring to obligations not imposed by the 2016 Order. The Laboratory's permitting violations under the Hazardous Waste Facility Permit, for instance, "are entirely distinct from the corrective actions that are required to be performed under the 2016 Order." Supplemental Rhodes Decl. ¶ 3, ECF No. 132-1. And as for the 2018 letter from NMED concerning improperly stored waste, DOE says that the waste was stored at a facility not covered by the 2016 Order, so NMED's penalty letter is irrelevant. Supplemental Rhodes Decl. ¶ 8. Second, DOE says that Plaintiff's evidence of DOE's performance under the 2005 Order (*i.e.* getting extensions and supposedly not doing

---

[7] The Court cannot access the websites that Plaintiff refers to in support of categories two through four discussed above. Plaintiff's evidence is therefore submitted in an inadmissible form. At summary judgment, though, the Court may consider such evidence, "so long as the content or the substance of the [evidence] could be presented in an admissible form at trial." *Fid. & Deposit Co. of Maryland v. Riess Family, LLC*, 769 F. App'x 538, 545 (10th Cir. 2019).

numerous other tasks) is irrelevant because its "performance under the 2005 Order is not a predictor of DOE's future performance under the 2016 Order." DOE's Reply Br. at 7, ECF No. 132.

The Court notes that the voluntary cessation exception to the mootness doctrine does consider the effect of an alleged pattern of delay. *See e.g.*, *WildEarth Guardians*, 690 F.3d 1174, 1186 (10th Cir. 2012) (noting that the plaintiff's Clean Air Act civil penalties claim was moot in part because the defendant did not have a "history or pattern" of violations, and the particular violation alleged was unlikely to be repeated.); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1207 (11th Cir. 2007) (Cox. J., concurring in part and dissenting in part) (describing "the first voluntary cessation factor [as] whether the challenged conduct was isolated or part of a pattern"); *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (noting that when injunctive relief is sought, the court considers the defendant's "bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."). The parties' evidence presents a sufficient disagreement concerning DOE's alleged pattern of delay and whether such a pattern is a predictor of future behavior, requiring resolution by the fact finder.

NMED's, Plaintiff's, and DOE's motions for summary judgment are denied.

### ii. Plaintiff's Claims against LANS

Based on the evidence in the record that LANS no longer has an operational or cleanup role at the Laboratory, Plaintiff's civil penalty claims against it are moot. It is undisputed that LANS's waste remediation contract was given over to Newport News Nuclear BWXT – Los Alamos, LLC in May 2018 and that its management and operating contract ended in October 2018 and that LANS is winding down its business. It is also undisputed that LANS has no responsibility

for the selection, implementation, or timing of any remediation tasks, nor does it have any duty to meet remediation deadlines in the 2016 Order.

Perhaps most importantly, as of November 2018, LANS is no longer the co-permittee and co-operator on the RCRA-permit for the Laboratory. This consideration is key. In *Laidlaw* the Supreme Court believed that it was not clear whether the facility's CWA violations "could not reasonably be expected to recur," in part because the facility retained its pollutant discharge permit. 528 U.S. at 193-94, n. 6. Here, the opposite is true: LANS is off the RCRA-permit and its various roles at the Laboratory have ended. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (two business entities could not possibly commit future RICO violations where they no longer existed by the time of appeal, and the district court found that they had come to exist just to wind down business); *Communities for a Better Env't v. Tosco Ref. Co.*, No. C 00-0248 SI, 2001 WL 114441, at *8 (N.D. Cal. Jan. 29, 2001) (defendant's sale of its refinery and water pollutant permit "ma[de] it absolutely clear that [Tosco's] permit violations could not reasonably be expected to recur," and therefore, "there is no prospect of future violations for civil penalties to deter.") (citing *Laidlaw,* 528 U.S. at 193)). Plaintiff's civil penalty claims against LANS are moot.

In its response brief, Plaintiff submits rebuttal evidence purporting to show that LANS retains a presence at the Laboratory because a corporate partner of LANS is a current clean-up contractor at the Laboratory. LANS replies that Plaintiff "has gotten its facts wrong," and explains that one of the four partners in the LANS LLC has a corporate relationship with the Laboratory's new remediation entity. LANS's Reply Br., ECF No. 127, 11. Plaintiff also submitted a declaration from Mr. Alvarez who opined that civil penalties against LANS would have a future deterrent

effect against both DOE and any current or future private waste remediation contractors. *See* Alvarez Decl. ¶ 9(a)-(c), ECF No. 118-1.

Plaintiff's evidence does not raise a triable issue. Even if Plaintiff's allegations are correct, a reasonable fact finder could only conclude that LANS has no role at the Laboratory. The end of LANS's waste remediation and management presence, its removal from the RCRA-permit, and the undisputed fact that LANS has no obligations for future remediation tasks is more than sufficient evidence to show that, as to LANS, there is "no reasonable expectation that the wrong will be repeated," and that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66 (emphasis and quotation marks omitted). Summary judgment is granted to LANS and against Plaintiff on all of Plaintiff's claims – *i.e.* Plaintiff's claims for RCRA civil penalties and attorney's fees. None of those claims remain justiciable. *See WildEarth Guardians*, 690 F.3d at 1178-79, 1186-87.

LANS additionally moves the Court to abstain from exercising jurisdiction.[8] Abstention permits a district court to "decline to exercise or postpone the exercise of its jurisdiction," and "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). The Court need not address or decide LANS's abstention argument. Rather, the Court deems this request moot in light of the Court's grant of summary judgment to LANS on Plaintiff's claims.

---

[8] LANS contends that NMED also moved for abstention. The Court does not agree. While NMED did request that the Court "abstain from imposing civil penalties in this case, and defer to NMED's regulatory authority, policy decisions, and technical expertise with respect to regulation of environmental waste," NMED cited no authority or summary judgment evidence in support of this request. NMED's MSJ at 4. Moreover, this opinion only holds that triable issues of preclude the entry of summary judgment in favor of any party except LANS; this opinion does not assess penalties.

**IT IS THEREFORE ORDERED that** Intervenor New Mexico Environment Department's Motion for Summary Judgment on Counts I and II of Plaintiff's Second Amended Complaint **(ECF No. 91)**; Plaintiff's Motion for Partial Summary Judgment against the United States Department of Energy **(ECF No. 92)**; Plaintiff's Motion for Partial Summary Judgment against Los Alamos National Security, LLC **(ECF No. 94)**; and the United States Department of Energy's Opposed Motion for Summary Judgment **(ECF No. 101)** are **DENIED**.

**IT IS FURTHER ORDERED that** Defendant Los Alamos National Security, LLC's Motion for Summary Judgment **(ECF No. 96)** is **GRANTED** and that Plaintiff's claims asserted against that Defendant are hereby **DISMISSED** in their entirety.

**IT IS SO ORDERED**.

Senior United States District Court Judge